Filed 5/30/13  D.Y. v. Super. Ct. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| D.Y.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF SONOMA,<br><br>        Respondent;<br><br>SONOMA COUNTY HUMAN SERVICES DEPARTMENT et al.,<br><br>        Real Parties in Interest. | A138072<br><br>(Sonoma County Super. Ct. No. 3903-DEP) |

D.Y. (Father), father of one-year-old D.H., petitions this court pursuant to California Rules of Court, rule 8.452, to set aside the juvenile court's order terminating reunification services to him and the mother of D.H. (Mother) and setting a permanency hearing under Welfare and Institutions Code section 366.26 (section 366.26 hearing).[1] He contends there was no substantial evidence supporting the finding that he was provided with reasonable reunification services.  We reject the contention and deny the petition on the merits.

---

[1]  All further statutory references are to the Welfare and Institutions Code.

1

## FACTUAL AND PROCEDURAL BACKGROUND

The Sonoma County Human Services Department (the Department) filed an original petition on April 30, 2012, alleging that Father, who was named as a presumed father in the petition, and Mother, had failed to protect D.H. Mother had mental health and substance abuse issues and was unable to provide adequate care and support for D.H. She had been placed on an involuntary psychiatric hold while D.H. was in her care and "was assessed as unable to safely care for herself or the child." During her pregnancy, she was diagnosed with " 'Narcotic Addiction with drug-seeking behavior' " and " 'non-compliance with medical treatment.' " She failed to follow through with referrals to psychiatrists, mental health case managers, a public health nurse, and the Drug Free Babies Program. Father was aware of Mother's issues yet allowed her to continue to care for D.H. Father also "ha[d] a propensity for substance abuse . . . [and had been] arrested approximately thirteen times with six convictions (4 felony) for substance abuse related crimes" from 1987 to 2009. The court detained D.H.

On May 23, 2012, Father and Mother submitted on the allegations and the court sustained the petition. The court further found that giving Father presumed father status may have been premature in light of evidence the Department presented that Father's name was not on the birth certificate, he and Mother had never been married, and D.H. had never lived with Father. After a contested hearing on the issue of paternity, the court ruled that Father did not meet any of the conditions necessary to establish a legal presumption of paternity, and that he was therefore ineligible for reunification services. The court advised that "this determination could change" as the court retained continuing jurisdiction over the issue.

Father filed a notice of appeal in our court on July 23, 2012, challenging the order denying his request for presumed father status. Father also filed a section 388 petition for an order reinstating his presumed father status, stating he had signed a declaration of paternity. The court granted the section 388 petition and elevated Father to presumed father status, and in an order filed October 17, 2012, granted him reunification services. We thereafter dismissed Father's appeal regarding paternity as moot.

2

Father's case plan identified substance abuse, anger management, and parenting as issues and recommended that he "participate in and complete a course of Domestic Violence/Anger Management," parenting education sessions, a substance abuse evaluation at DAAC (Drug Abuse Alternative Center) and "follow all recommendations resulting therefrom, including . . . residential substance abuse treatment, out-patient substance abuse treatment, 12-Step meetings and substance use testing." The case plan also stated that Father was to "cooperate with the assigned social worker accepting all referrals for services, keeping the social worker informed of all changes in circumstances (including changes in housing, household composition, and participation in services) . . . ."

In its status review report of December 6, 2012, the Department stated it was not able to obtain a clear understanding of Father's current circumstances due to his "lack of communication." Father had not complied with a single component of his case plan. He had not drug tested, had not completed a substance abuse assessment even though he had been referred to DAAC as early as May 15, 2012, had not participated in parenting education sessions, and had not attended an anger management program. He had visited D.H. only twice, and because he was not present for most of the visits, he had been unable to work with the parent educator. During the visits he attended, he appeared to have minimal knowledge of age appropriate behavior for an infant. He had not submitted verification sheets for attendance in a 12-step program and the Department had been unable to make referrals for him due to his lack of communication and cooperation. Even before the court awarded services to Father, the Department had referred Father to drug treatment and had also provided him with bus passes and supervised visits. The Department met with Father on five occasions between July 2 and October 11, 2012, and also made efforts to meet with him to review his case plan and provide him with services as soon as the court granted services to him in October 2012.

The Department further reported that Father had a history of becoming aggressive while at the Department and in the presence of the social worker. Due to Father's angry outbursts, the Department had a guard present during visits. Father also had a very

3

difficult time taking responsibility for his actions. The Department recommended that reunification services be terminated as to both parents. At a review hearing on December 6, 2012, Father requested a settlement conference and a contested hearing.

On February 5, 2013, the Department filed an addendum report recommending termination of services for both parents. According to the report, Father had visited D.H. only sporadically. He did not call to cancel and did not show up for visits, was incarcerated during one visit, and on one occasion was so loud and aggressive that the Department's staff members spent 30 minutes trying to calm him down. Father did not return the social worker's phone calls, went " 'out of town' " without notifying the social worker, and otherwise did not maintain contact with the social worker. When the social worker informed Father on November 11, 2012, that the Department would be recommending termination of services, Father said, " 'you guys are stealing my baby.' " The social worker reminded Father that he had failed to meet with her or show up for visits. Father acknowledged that was true, then asked to visit D.H. on November 13, 2012. The Department scheduled a visit but Father did not show up and did not call to cancel. When the social worker called Father about the missed visit, he said he " 'was coming [down] with the flu or something.' " The social worker then asked Father to drug test, which he failed to do.

When the social worker tried to contact Father on December 11, 2012, to schedule a meeting to discuss his case plan, Father did not answer his phone and his voicemail box was full. The social worker then attempted to set up a meeting with him by sending him a letter on December 19, 2012. The social worker also called various contact numbers for Mother and Father in hopes of finding Father, but was unable to locate him. On January 7, 2013, Mother informed the social worker that Father was in jail. The social worker spoke to Father on January 17 and 22 and met with him at jail to encourage him to participate in any parenting, alcohol, or anger management groups available to him in jail. The social worker also provided him with 12-step meeting attendance verification sheets. At a review hearing on February 22, 2013, the court continued reunification services but scheduled a contested hearing for March 4, 2013, on the issue of services.

4

At the start of the contested hearing, Father made a *Marsden* motion (*People v. Marsden* (1970) 2 Cal.3d 118), which the court heard and denied. Thereafter, Father was so disruptive during the proceedings that the court admonished him several times, and ultimately gave him a "last warning" that he would be removed from the courtroom if he continued to interrupt people or "provide[d] the court with a distraction."

Social worker Juana Marquez, who was assigned to the case, testified that D.H. was removed from her parents in part due to Father's drug and alcohol abuse and criminal history relating to his drug and alcohol use. She testified regarding the services the Department had provided to Father, including referring him to DAAC on three separate occasions—May 2012, October 2012, and February 2013. As of the date of the hearing, Father had still not contacted DAAC. He voluntarily participated in a residential treatment program in or about May 2012 but left in about August 2012 without completing the program and was "picked up on warrants" for shoplifting that same month. Father also drug tested at the beginning of the case but had not tested a single time after that. When Marquez called Father in September 2012 asking him to drug test, Father became "very aggressive" and yelled at her, "Well, fuck you, bitch." He was also difficult during visits and "would usually become very aggressive, loud and demanding," requiring the Department to have a security guard present during visits.

Marquez further testified that she had a difficult time communicating with Father, who would "come in" to her office periodically to ask for bus passes or visits, but was otherwise difficult to get a hold of. He had provided her with multiple contact numbers, many of which were not numbers at which he could be reached. Father did call at times but he would leave no contact information, or if he did, Marquez would call back and no one would answer. When she called Father on October 29, 2012, to set up a meeting to discuss his case plan and provide him with referrals, she was unable to reach him. On November 8, 2012, Marquez was able to reach Father on the phone and asked him why he had not scheduled a meeting, and why he was not visiting D.H. He responded that he had been out of town, but when asked where he was, responded that it was "none of [Marquez's] business." Marquez told Father that the visits were still happening and gave

him the date for the next visit.  Father did not show up for the visit and also missed the rest of the November visits.  From the time he was elevated to presumed father status in October 2012 to mid-February 2013, Father had missed five of six scheduled visits. Father was incarcerated in November 2012 for shoplifting.

As Father's counsel cross-examined Marquez, Father became upset, stating that his attorney was "not going to the meatball of this case," and that the hearing was "a circus."  He stated, "I'm leaving, man.  I'm leaving, man. [¶] . . .[¶] This is a circus, man. You guys are just a straight circus, man."  As the court began to speak, Father interrupted, stating, "Right.  Removed.  I'm gone.  Bye-bye.  I object, man.  And stay out of my life, man.  I'm taking this shit to the Ninth Circuit Appeal, man."  Mother also left the courtroom.  Upon conclusion of Marquez's testimony, the court heard closing arguments, then ruled that "it was clear that Father did not engage in terms of making substantive progress or regularly participating in services."  The court further found that consistent visitation "was simply not there," and also noted there were "only 2 months left to the 12 month date by which time services absolutely would come to an end."  The court terminated reunification services and scheduled a section 366.26 hearing.

### DISCUSSION

Father contends there was no substantial evidence supporting the finding that he was provided with reasonable reunification services.  We disagree.

If, at the six-month review hearing, "the court finds . . . that the child, who was under three years of age on the date of initial removal or is a member of a sibling group [in which one of the siblings was under the age of three years on the date of initial removal],[2] may be returned to his or her parent or legal guardian within six months *or that reasonable services have not been provided*, the court shall continue the case to the 12-month permanency hearing." (§ 366.21, subd. (e), italics added.)  A court may terminate reunification services and order the setting of a section 366.26 permanency

---

[2]  D.H. was only one month old at the time of removal.

hearing only if "there is clear and convincing evidence that reasonable services have been provided or offered to the parent . . . ." (§ 366.21, subd. (g)(1)(C).)

The reasonableness of services is judged according to the circumstances of each case. (*Armando L. v. Superior Court* (1995) 36 Cal.App.4th 549, 554.) A social services agency is required to make a good faith effort to address the parent's problems through services, to maintain reasonable contact with the parent during the course of the plan, and to make reasonable efforts to assist the parent in areas where compliance proves difficult. (*Id.* at pp. 554-555.) "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) We determine whether substantial evidence supports the court's finding that reasonable services were provided, reviewing the evidence in a light most favorable to the prevailing party and indulging in all reasonable inferences to uphold the court's ruling. (*Id.* at p. 545.)

The reunification plan prepared by the Department and ordered by the court was appropriately designed to address the issues that led to the removal of D.H. from Father's care and custody. Among other things, the plan required Father to attend anger management classes and substance abuse classes, be tested for drug use, maintain contact with the Department, and obtain an assessment from DAAC. Father did not comply with a single component of his case plan. He failed to drug test, did not attend an anger management program, did not participate in parenting education sessions, and had not completed a substance abuse assessment even though he had been referred to DAAC on three occasions. He did not visit D.H. regularly and did not maintain contact with the social worker.

Father complains that services were not offered to him until October 17, 2012, due to the erroneous finding that he was only an alleged father, and that the Department should therefore be "equitabl[y] estopp[ed] . . . from [arguing] that . . . [he] delayed in establishing paternity." He argues that as a result of the uncertainty in his status, he "was

7

only a presumed [father] for approximately three to four months during the life of the case," which "was not enough time . . . ." The record shows, however, that even before paternity was established, the Department was providing him with various services including meeting with him to discuss a case plan, referring him to drug treatment, offering drug testing, and providing him with bus passes and visitation. Further, once paternity was established, and until services were terminated in March 2013, the Department made efforts to provide services to him by, among other things, continuing to refer him to DAAC, visiting him in jail to encourage him to participate in services available to him there, calling him numerous times to schedule meetings to discuss his case plan, and offering drug testing and visitation supervision. Thus, any delay in establishing paternity did not result in a denial of reasonable reunification services.

Father also complains the Department failed to maintain regular contact with him. The record shows, however, that the Department went through great efforts to try to maintain contact with Father by, among other things, calling him numerous times, trying to leave voice mail messages for him, calling Mother and her contacts to see if they knew where Father was, sending him letters, and meeting with him in jail. Father, on the other hand, often did not return calls, left no contact information, and disappeared for periods of time. " 'The requirement that reunification services be made available to help a parent overcome those problems which led to the dependency of his or her minor children is not a requirement that a social worker take the parent by the hand and escort him or her to and through classes or counseling sessions.' " (*In re Christina L.* (1992) 3 Cal.App.4th 404, 414.) Here, the record shows that Father's "real problem was not a lack of services available but a lack of initiative to consistently take advantage of the services that were offered." (See *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.)

Finally, Father claims the Department made little or no effort to find a relative placement for D.H. Father has not shown, however, that efforts to find a relative

8

placement is a factor—or even relevant—in determining reasonableness of services.[3]  We therefore reject his claim.  In sum, the conditions of the reunification plan were reasonable, sensible and fair, and were properly designed to prevent a recurrence of the circumstances that led to the removal of D.H.  (See *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1776-1777.)  We conclude there is substantial evidence to support the juvenile court's finding that the Department made reasonable efforts to provide Father with adequate reunification services, and that the reunification services provided were reasonable.

### DISPOSITION

The writ petition is denied.  Our opinion is final as to this court forthwith.

_____
McGuiness, P.J.

We concur:

_____
Pollak, J.

_____
Siggins, J.

---

[3]  The Department argues that "relative placement efforts are not required to make a reasonable services finding," but asserts, alternatively, that there are post-judgment documents—of which it asks us to take judicial notice—showing the Department adequately assessed relative placement options.  In light of our conclusion that proof of relative placement efforts is not required in making a reasonable services finding, we deny the Department's request for judicial notice.

9